UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ERIK PARTAK,

                                        Plaintiff,

            -v.-

                                                            9:09-CV-1256
PETER D. BEHRLE, *et al.,*                                  (FJS/ATB)

                                        Defendants.
_____

ERIK PARTAK
05-A-6124
Plaintiff, *pro se*
JAMES SEAMAN, Asst. Attorney General
Attorney for defendants

ANDREW T. BAXTER, United States Magistrate Judge

### ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation by the

Honorable Frederick J. Scullin, Jr., Senior, United States District Judge, pursuant to

28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In his second amended complaint, plaintiff alleges that he was denied due

process in connection with a disciplinary hearing, after which he was found guilty of

drug possession, and that defendants were retaliating against him for complaining

about one of the defendants to a member of the Inspector General's Office. (Second

Amended Complaint SAC) (Dkt. No. 65).  Plaintiff also alleges that he was housed in

filthy conditions that violated his Eighth Amendment right to be free from cruel and

unusual punishment. *Id.*  Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion to dismiss the second amended complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. No. 73).  Plaintiff has responded in opposition to defendants' motion and has cross-moved to amend the second amended complaint, and has filed a proposed third amended complaint. (Dkt. Nos. 74, 79, 79-1(TAC)).  Defendants have filed a reply to plaintiff's opposition to the dismissal motion and have opposed the motion to amend. (Dkt. Nos. 75, 80).  Plaintiff has filed a sur-reply to defendants' reply in connection with the motion to dismiss. (Dkt. No. 78).

For the following reasons, this court will deny plaintiff's motion to amend and recommend granting defendants' motion to dismiss the complaint in its entirety.

## DISCUSSION

I.   <u>Facts</u>

   A.   **Second Amended Complaint**

Plaintiff alleges that he was incarcerated in cell 200 of the Greene Correctional Facility Special Housing Unit (SHU) from May 2006 until April 4, 2007. (SAC ¶ 1). Plaintiff states that at some time between November 2006 and January of 2007, he was taken out of his cell for a "cell frisk." (SAC ¶ 2).  Plaintiff claims that during the cell frisk, defendant Klein asked plaintiff whether he previously lived in the "Albany region" and then asked plaintiff about mutual acquaintances. (SAC ¶ 3).  Plaintiff states that after a few minutes of conversation, it became apparent that he and

2

defendant Klein knew many of the same people. (*Id.*)

Plaintiff states that the following day, defendant Klein approached plaintiff's cell and asked him whether he knew Michael Susko, who happened to be defendant Klein's roommate and who was dating a woman who dated plaintiff. (SAC ¶¶ 4-5). Plaintiff claims that he acknowledged knowing Mr. Susko and then tells a story about plaintiff intervening when Mr. Susko was "beating" his (and plaintiff's) girlfriend. (SAC ¶¶ 5-6). Plaintiff explained to defendant Klein that plaintiff was only "trying to keep the peace," but that Mr. Susko "burst out in a fit of rage." (SAC ¶ 7).

Plaintiff claims that as a result of this conversation, defendant Klein threatened plaintiff by stating "that's my boy's girl you were messing around with.  Now you're in my house, we'll see how well you fare now." (SAC ¶ 8).  Plaintiff alleges that after that conversation, between January 2007 and April 2007, defendant Klein began harassing plaintiff by ordering him to submit to numerous urine tests. (SAC ¶ 9).  On April 1, 2007, when plaintiff had only three days left in SHU, defendant Klein moved plaintiff to a foul-smelling, filthy cell, with a "clearly incompatible" roommate, for no reason. (SAC ¶ 10).  On April 4, 2007, plaintiff was transferred to Great Meadow Correctional Facility, and plaintiff claims that, shortly thereafter, defendant Klein was transferred to the same facility. (SAC ¶¶ 11-12).

Plaintiff states that on August 2, 2007, he received a misbehavior report, and was "given" defendant Klein as an assistant for plaintiff's Tier III disciplinary hearing.

3

(SAC ¶ 13).  Plaintiff alleges that defendant Klein asked plaintiff to provide information on prior drug smuggling that had occurred at Greene, but plaintiff refused, and defendant Klein became frustrated and threatened plaintiff again by stating that "I got a trick for a tough guy like you." (SAC ¶ 14).  On September 7, 2007, plaintiff was transferred back to Greene and was again housed in SHU-200 cell. (SAC ¶ 15).

Plaintiff claims that between November 2007 and January 2008, Inspector Feliciano from the Inspector General's Office came to Greene to visit plaintiff. (SAC ¶ 16).  During plaintiff's interview with Inspector Feliciano, plaintiff complained about defendant Klein and told the inspector that the problems with defendant Klein "stemmed from the streets." (SAC ¶ 17).  Plaintiff stated that all of defendant Klein's friends worked at Greene, and that plaintiff felt that these friends would retaliate against plaintiff after learning of his complaints to Inspector Feliciano. (*Id.*)

Plaintiff claims that in February of 2008, he spoke to defendant Tietz about defendant Klein and his roommate Mr. Susko. (SAC ¶ 18).  Coincidentally, defendant Tietz also was very good friends with Mr. Susko, and "strongly suggested" that plaintiff withdraw the statements he made against Klein to Inspector Feliciano. (*Id.*) When plaintiff refused to do so, defendant Tietz "implied Plaintiff would suffer some form of retaliation as a result, and then stated, '[w]hat goes around comes around, maybe not right now, but certainly, later on down the line.'" (*Id.*)

On April 21, 2008, defendant Santos ordered that plaintiff undergo a "random"

4

urine test. (SAC ¶ 19).  On April 23 and 24, 2008, when plaintiff had less than two weeks left of his stay in SHU, defendant Santos ordered plaintiff to undergo two more "random" urine tests. (SAC ¶¶ 21-22).  Plaintiff complains that he was brought back to his cell at approximately 3:30 p.m. on April 24, 2008,[1] and at 5:30 p.m., defendant Bailey[2] and Plonka took plaintiff out of his cell for a cell search. (SAC ¶ 26).

As a result of this search, the officers discovered a white powder substance that defendant Ruff tested using a NIK Test. (SAC ¶ 27 & Ex. A).  Plaintiff claims that defendant Ruff did not use the proper protocol for the test, and the substance tested positive for seven grams of cocaine "in error." (*Id.* & Ex. B).  Plaintiff claims that defendant Ruff, who is certified to conduct the NIK Test, conducted only one test following his first "positive" reaction, in violation of the Departmental Policy requiring "several tests" to be performed after a positive test. (SAC ¶¶ 27-28).

Defendant Gibilaro ordered the officers to place plaintiff in a filthy cell, in which the toilet was clogged with feces. (SAC ¶ 29).  Plaintiff claims that he asked defendants Bailey and Plonka for a plunger, and that Plonka replied that plaintiff would get one in the morning, but he never did, so he lived in a cell with feces for

---

[1] Plaintiff claims that while taking plaintiff to the bathroom, the officers placed the waist chain and the handcuffs on plaintiff so tightly that his circulation was cut off and his wrists became red. (SAC ¶ 24).  Plaintiff claims that when he asked the officers to loosen the handcuffs so he could comply with the order to give a urine sample, one officer responded, "tough shit." *Id.*

[2] Plaintiff has spelled this defendant's name "Baily," however, it is clear from the documents that the correct spelling is "Bailey," and the court will use the proper spelling in this Report-Recommendation.

three days. (SAC ¶ 30).  On April 24, 2008, plaintiff was given a misbehavior report, charging him with possession of a controlled substance (7 grams of cocaine). (SAC ¶ 31 & Ex. C).  Plaintiff maintained his innocence and wrote a letter to defendant Behrle, the Superintendent of Greene, stating that the white powder that was found in his cell was "AJAX," and that defendant Ruff failed to follow proper testing procedures. (SAC ¶ 32).  Plaintiff alleges that on April 29, 2008, he was moved to the top bunk for no reason, and that when he asked defendant Santos why she did that she replied that she was the "fucking sergeant" and would "do whatever [she wanted] to do." (SAC ¶ 33).

Plaintiff states that his Tier III disciplinary hearing was assigned to defendant Commissioner's Hearing Officer ("CHO") Gutwein, who began the hearing on April 29, 2008, and he continued it on May 7, 2008. (SAC ¶ 37).  Plaintiff claims that CHO Gutwein made many errors during the hearing that resulted in a denial of due process. (*Id.*)  Plaintiff claims that he requested an adjournment of the hearing in order to wait for the "outside agency" drug test to be completed, so that the result could be admitted as evidence, but defendant Gutwein refused in violation of New York Law. (*Id.*)  On May 2, 2008, defendant Ruff conducted a test of AJAX, using the NIK Test, and concluded that AJAX did not test positively for cocaine. (SAC ¶ 35).  Plaintiff claims that a memorandum written by defendant Ruff regarding this test was "exculpatory" and was improperly withheld from plaintiff until after the hearing. (*Id.*)  Plaintiff

claims that because of defendant Ruff's errors in conducting the test and his
"deviation from protocol," the NIK Test results were incorrect. (*Id.*)  Plaintiff also
claims that defendant Gutwein "dismissed the testimony of two witnesses": Morgan
Cox and Juan Benedict, who testified that there was AJAX in plaintiff's cell where the
powder was found. (*Id.*)

Plaintiff was ultimately found guilty of the violation and sentenced to 36
months in SHU, with 36 months loss of privileges, and 36 months recommended loss
of good time. (SAC ¶ 38 & Ex. G).  Plaintiff claims that, on May 7, 2008, Inspector
Feliciano interviewed plaintiff, and he claimed that he had been "set up" by Greene
staff in retaliation for speaking to the Inspector several months prior. (SAC ¶ 36).
Inspector Feliciano stated that she would take the cocaine from the evidence locker
and personally deliver it to the New York State Police Laboratories for immediate
testing. (SAC ¶ 36).  She told plaintiff that it would not take more than two weeks to
get the test results back. (*Id.*)

Plaintiff appealed his disposition to defendant Bezio, and claims that he made
defendant Bezio "personally aware" of defendant Ruff's failure to adhere to the rules
and to the governing Directives and of defendant Gutwein's failure to adhere to New
York State Law during the hearing. (SAC ¶ 39, Ex. H & Appendix C).  On June 20,
2008, defendant Bezio modified plaintiff's sentence to 18 months SHU, 36 months
loss of certain privileges, and only 24 months recommended loss of good time, but

7

affirmed the rest of the disposition. (SAC ¶ 44).

Plaintiff states that on May 17, 2008, defendant Santos moved plaintiff to a different cell for no reason, and that this cell was filthy, with feces smeared on the wall next to the toilet. (SAC ¶ 40).  Plaintiff claims that defendant Santos refused to provide cleaning supplies, and that she gave plaintiff an "incompatible" roommate, deliberately trying to provoke problems between the two inmates. (*Id.*)  Defendant Santos also went through plaintiff's property, and removed pictures of his wife, without providing plaintiff with a "contraband slip." (*Id.*)  The pictures were never returned. (*Id.*).

Plaintiff states that on May 20, 2008, he wrote a letter to the New York State Police and requested a copy of the test results under the Freedom of Information Law (FOIL). (SAC ¶ 41).  In June of 2008, plaintiff wrote to the Greene Disciplinary Office and requested the test results, but was told by "interdepartmental communication" from Lt. Robbiani, that the test results had not yet been forwarded to Greene. (SAC ¶ 43).  On July 9, 2008, plaintiff's FOIL request was denied, and plaintiff appealed that decision on July 29, 2008.[3] (SAC ¶ 45).  Plaintiff states that on July 30, 2008, his Tier III hearing disposition was "reviewed and administratively reversed," but that he remained in SHU until August 18, 2008, when he was released into general population. (SAC ¶ 48).

---

[3] His appeal was later denied on August 19, 2008. (SAC ¶ 50).

Plaintiff claims that defendant Behrle, the Superintendent of Greene, failed to protect plaintiff's "liberty interests from cruel and unusual punishment" by ignoring the due process violations caused by defendant Behrle's subordinates: defendants Gutwein, Gibilaro, Santos, Ruff, Bailey, Plonka, Tietz, and Klein. (SAC ¶ I) (Dkt. No. 65 at 12).

Plaintiff also alleges that defendant Gutwein violated Department policy, both in the applicable regulations and in the Department of Correctional Services ("DOCS")[4] Directives, withheld "exculpatory" evidence, and then used that evidence to find plaintiff guilty of the violation. (SAC ¶ II).  Plaintiff claims that, when he personally informed defendant Bezio of the due process violations allegedly committed by his subordinates, Ruff and Gutwein, defendant Bezio failed to correct those violations. (SAC ¶ III).  Finally, plaintiff adds that defendants Gibilaro, Santos, Ruff, Bailey, Plonka, Tietz, and Klein used "retaliation without need or provocation" and failed to "intervene to prevent misuse of power," in violation of the Eighth Amendment. (SAC ¶ IV).

## B.   Proposed Third Amended Complaint

In plaintiff's proposed third amended complaint, he seeks to add a new

---

[4] On April 1, 2011, DOCS and the New York State Division of Parole were merged into one agency, named the New York State Department of Corrections and Community Supervision. Because the events relevant to this suit occurred before the merger, I will refer to New York State's corrections agency as "DOCS."

defendant and ten new paragraphs[5] to his second amended complaint. (Dkt. No. 79).

Plaintiff also seeks to add exhibits to the second amended complaint, including

portions of the transcript of his disciplinary hearing and a copy of the negative outside

laboratory drug test. (*See e.g.* Dkt. 79-1, Exs. M, O & P). The new defendant is

Inspector Feliciano, who plaintiff now alleges failed to remedy the alleged wrongs

done by the Greene Correctional Facility defendants and allowed these wrongs to go

"unrepremanded," by failing to "investigate and charge" the Greene Correctional

Facility officials with "evidence tampering." (Dkt. No. 79-1 ¶¶ 18, 38-39, 56, 58)

(Third Amended Complaint (TAC)).  Plaintiff seeks to add claims against defendant

Director of Special Housing, Bezio for failing to release plaintiff "promptly" from

SHU after "having personal knowledge of plaintiff's innocence." (TAC ¶ 54).

Plaintiff also seeks to add facts regarding defendant Tietz.  Plaintiff seeks to

bolster his retaliation claims by alleging that defendant Tietz escorted plaintiff to his

interview with Inspector Feliciano, that the door to the interview room was left open,

that defendant Tietz stayed outside the room while the interview was being conducted,

and that defendant Tietz overheard the plaintiff's very specific complaints about

defendant Klein. (TAC ¶ 17).  Plaintiff alleges that these specific complaints included

that his "problems" with defendant Klein "stemmed from [plaintiff's] knowledge of

---

[5] These ten new paragraphs are: ¶¶ 18, 38, 39, 53-59.  One paragraph from the Second Amended Complaint has been removed: ¶ 50.

defendant's ties to known criminal associates in the streets, and [defendant Klein's] endeavors with such criminal associates." *Id.*  Plaintiff also claims that he "advised said Inspector that all of defendant Kline's [sic] friends currently worked in GCF and that [plaintiff] felt they would retaliate after learning of the statements [plaintiff] made against him." *Id.*

Plaintiff also seeks to add some facts regarding his conditions of confinement claims.  Plaintiff now alleges that when he was not given a plunger to unclog his toilet for three days, he was "forced to defecate on a piece of paper on the floor and throw it outside his 'rec-pen." (*Compare* SAC ¶ 30 *with* TAC ¶ 31).  Plaintiff also claims that he was forced to urinate in the sink and that he became sick because of the methane and ammonia odors and repeatedly threw up in the sink.[6] *Id.*

## II.    **Motion to Dismiss**

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice.  *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).  Plaintiff's factual allegations must also be

---

[6] The court notes that plaintiff included these facts in his memorandum of law in opposition to defendants' motion to dismiss. (Dkt. No. 74 at 29; pages as numbered by plaintiff at the bottom of the page).

sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp*., 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)). Finally, in the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell*, 419 F. Supp. 2d 521, 525 (S.D.N.Y. 2006) (citation omitted).

## III. __Motion to Amend__

Federal Rule of Civil Procedure 15(a) provides that the court should grant leave to amend "freely . . . when justice so requires." Generally, the court has discretion

12

whether or not to grant leave to amend a pleading. *Foman v. Davis*, 371 U.S. 178, 182

(1962). Where it appears that granting leave to amend is unlikely to be productive or

the amendment is futile, it is not an abuse of discretion to deny leave to amend.

*Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993) (citations omitted).

The decision to grant or deny a motion to amend is committed to the sound discretion

of the trial court, and the court's decision is not subject to review on appeal except for

abuse of discretion. *Nettis v. Levitt*, 241 F.3d 186, 192 (2d Cir. 2001). An amendment

is futile if the pleading fails to state a claim or would otherwise be subject to

dismissal. *U.M.G. Recordings, Inc. v. Lindor*, CV-05-1095, 2006 U.S. Dist. LEXIS

83486, *5-6 (E.D.N.Y. Nov. 9, 2006); *S.S. Silberblatt, Inc. v. East Harlem Pilot

Block*, 608 F.2d 28, 42 (2d Cir. 1979). The analysis is similar to that employed in a

motion to dismiss. *Stetz v. Reeher Enterprises, Inc.*, 70 F. Supp. 2d 119, 121

(N.D.N.Y. 1999).

In the case of proposed amendments where plaintiff wishes to add a defendant,

the Court must also look to Rule 21 of the Federal Rules of Civil Procedure. Rule 21

states that the court may permit a party to be added to an action "at any time, on just

terms." Fed. R. Civ. P. 21. Rule 21 is "intended to permit bringing in a person, who

through inadvertence, mistake or for some other reason, had not been made a party

and whose presence as a party is later found necessary or desirable." *United States v.

Commercial Bank of North America*, 31 F.R.D. 133, 135 (S.D.N.Y. 1962) (internal

quotations omitted).  Addition of parties under Rule 21 is guided by the same liberal standard as a motion to amend under Rule 15. *Fair Housing Development Fund Corp. v. Burke*, 55 F.R.D. 414, 419 (E.D.N.Y. 1972).

In this case, defendants made their motion to dismiss on February 14, 2011. (Dkt. No. 72).  Plaintiff filed his motion to amend on April 11, 2011. (Dkt. No. 79).  Because the standard for futility of amendment is equivalent to the standard for a motion to dismiss, this court has considered all of plaintiff's submissions and the facts stated in both his second amended complaint and his proposed third amended complaint in determining that defendants' motion to dismiss should be granted.  The court finds that, notwithstanding plaintiff's efforts to bolster his claim in the proposed third amended complaint, these allegations will not survive a motion to dismiss.  Thus, the court will deny the motion to amend at the same time that it recommends granting defendants' motion to dismiss.

## IV.   Proposed Claim Against Inspector Feliciano

Inspector Feliciano was not named in plaintiff's second amended complaint, thus, the defendants' motion to dismiss is not addressed to any actions by this defendant.  This court finds that plaintiff's motion to add this defendant must fail because the amendment is futile and would not survive a motion to dismiss.  Inmates do not enjoy a constitutional right to an investigation of any kind by government officials. *Jordan v. Fischer*, 773 F. Supp. 2d 255, 278 (N.D.N.Y. 2011) (citing

14

*Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008); *Nieves v. Gonzalez*, No. 05 Civ. 17, 2006 WL 758615, at *3-4 (W.D.N.Y. March 2, 2006); *Longi v. County of Suffolk*, No. CV–02–5821, 2008 WL 858997, at *5–6, *22–23 (E.D.N.Y. Mar. 27, 2008)).  Thus, to the extent that plaintiff alleges that Inspector Feliciano conducted an inadequate investigation, or no investigation at all, into the alleged abuse by other defendants, this claim would not survive a motion to dismiss.

The court also notes that the proposed amendment may be read to allege that Inspector Feliciano was "deliberately indifferent" to the plaintiff's complaint about the defendants "ever plotting misconduct." (TAC ¶ 18).  Because the defendants were not reprimanded, the "misconduct escalated" to the point that plaintiff was "framed" with a large quantity of cocaine. *Id.*  A similar motion to amend was made and denied in *Brown v. Pritchard*, No. 09-CV-214, 2011 WL 2651806 (W.D.N.Y. July 6, 2011).

In *Brown*, plaintiff moved to amend his complaint to add a claim that the proposed Inspector General defendants disregarded inmate accusations against the corrections officers and allowed them to continue working until plaintiff was harmed. *Id.* at *5.  The court held that the Inspector General defendants did not owe a duty to plaintiff, and that "mere accusations" that were found by the Inspectors to be unsubstantiated, were not sufficient for a finding of liability against the Inspector, if the corrections officer in question is later accused of another incident. *Id.*

In this case, according to plaintiff, when he first spoke to defendant Feliciano,

plaintiff said that he advised the Inspector that all of defendant Klein's "friends" worked at Greene and that plaintiff "felt" that they would retaliate after learning of plaintiff's statements. (TAC ¶ 17). A "feeling" that someone was going to retaliate is not a substantiated complaint. It is unclear how Inspector Feliciano would have known which other officers plaintiff was referring to. It is also unclear how Inspector Feliciano would have been able to prevent the alleged "framing" of plaintiff. Although plaintiff now states that he "directly informed" Inspector Feliciano of the named defendants' "ever plotting misconduct, such a vaguely worded complaint would not indicate any particular actions by any of the defendants. Any claims against Inspector Feliciano would not survive a motion to dismiss, and plaintiff's motion to amend to add this defendant and any claims against her is denied.

## V.   **Due Process**

### A.   **Legal Standards**

Plaintiff makes various due process challenges to his disciplinary hearing. In order to begin a due process analysis, the court must determine, *inter alia*, that plaintiff had a protected liberty interest in remaining free from the confinement that he challenges. *Bedoya v. Coughlin*, 91 F.3d 349, 351 (2d Cir. 1996). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life." *Sealey v. Giltner*, 197 F.3d 578, 583 (2d Cir. 1999) (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)).  When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement.  *See Sealey*, 197 F.3d at 586; *Arce v. Walker*, 139 F.3d 329, 335–36 (2d Cir. 1998).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia*, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)).  The hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

Violations of state regulations with respect to disciplinary hearings do not, by themselves, necessarily rise to the level of constitutional violations.  *See, e.g., Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (state law violation does not necessarily rise to the level of a constitutional violation)*; Young v. County of Fulton*, 160 F.3d 899, 902 (2d Cir. 1998) (violation of state law is not the "benchmark" for determining whether a constitutional violation has occurred).  To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show

that he was prejudiced by the alleged procedural deficiencies, in the sense that the errors affected the outcome of the hearing. *See, e.g., Clark v. Dannheim*, 590 F. Supp. 2d 426, 429-31 (W.D.N.Y. 2008) (citing, *inter alia*, *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

## B.    Analysis

### 1.    Liberty Interest

Although plaintiff initially received a three year sentence in SHU, including a three year loss of good time, the determination was reversed, he did not lose good time, and he only spent approximately 106 days in SHU.  In any event, defendants appear to assume for purposes of this motion, that plaintiff did have a liberty interest in his original lengthy SHU sentence.[7]

Plaintiff now claims that DOCS received the test report, indicating that the substance was not cocaine on July 18, 2008, but he was not released from SHU until August 18, alleging that he was kept in SHU an extra 31 days.  In *Sandin v. Conner*,

---

[7] Defendant state that plaintiff must have a liberty interest before due process protections are required (Defs.' Mem. of Law at 14; Dkt. No. 72-1), and then begin their argument by stating that plaintiff received all the process he was due from defendant Gutwein (Defs.' Mem. of Law at 15-17). Thus, defendants assume, without argument, that plaintiff had a liberty interest in being free from the confinement to which he was ultimately subjected.  In his response, plaintiff argues that he had a liberty interest in being free from confinement for the 106 days that he was in SHU (Dkt. No. 74 at 5 - CM/ECF page numbering), however, there appears to be no dispute regarding this issue, and the court will proceed to consider whether plaintiff was afforded due process.

515 U.S. 472, 484 (1995), the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . , nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  The Court in *Sandin* determined that the inmate's discipline in segregated confinement for 30 days did not present the type of atypical, significant deprivation in which the state might create a liberty interest.  *Id.*

Plaintiff claims that he was not transferred back into General Population for 31 days after DOCS received the exculpatory test results.  He does not indicate that any of the named defendants were responsible for this extra confinement.  More importantly, the court notes that plaintiff alleges that his administrative hearing was not reversed until July 30, 2008 (SAC ¶ 47; TAC ¶ 50 & Ex. P).  The exhibit cited by plaintiff indicates that the document was received by the "Inspector General's Office" on July 18, 2008. (TAC ¶ Ex. P).  There is no indication when anyone else received this information.  The information would have to be processed, transmitted to the appropriate DOCS officials, and used to reverse plaintiff's disciplinary hearing, which apparently happened only twelve days later on July 30.  Thus, if anything, plaintiff was kept in SHU for an extra 18 days after the reversal of his disciplinary finding. The brief period of additional confinement is not sufficient to create a liberty interest

19

under *Sandin*.  Thus, any new claims regarding the extra time in SHU would not survive a motion to dismiss.

### 2.    Sufficiency of Evidence

Plaintiff's main challenges to the disciplinary hearing deal with sufficiency of the evidence.  His sufficiency arguments include a claim that defendant Gutwein violated state law by failing to obtain a test from an outside laboratory to confirm the NIK result and to include that "outside" laboratory result in the hearing record. Plaintiff also claims that defendant Gutwein failed to provide plaintiff with defendant Ruff's memorandum, in which he states that he performed a NIK test on AJAX and determined that AJAX does not produce a false positive result for cocaine.[8]  Finally, plaintiff alleges that defendant Gutwein "dismissed" the testimony of two of plaintiff's witnesses.[9]

### a.    Single Test Result

Plaintiff argues that he could not be found guilty of cocaine possession, utilizing only a single positive NIK test as evidence.  Plaintiff claims that he was entitled to a second test, performed by an outside laboratory, before he could be found

---

[8] Thus, even if the white powder had been AJAX, as plaintiff argued at the disciplinary hearing, it could not produced a "false positive" result.

[9] Because both of these witnesses testified extensively at the disciplinary hearing, this court has interpreted plaintiff's statements as a claim that his due process rights were violated because defendant Gutwein apparently did not believe their testimony, relating to the sufficiency of the evidence.

guilty of the drug possession.  He cites N.Y. Code Rules & Regs. (NYCRR), tit.7 §

1010.5(c) which provides that

> In a subsequent disciplinary hearing, the positive result of a test of suspected contraband drugs may be used as evidence that the suspected substance is what the test result indicates.  In addition to the misbehavior report, the inmate shall be served with the following documents and the record of the hearing must include:
>
> (a) the request for test of suspected contraband drugs form, see section 1010.8(a) of this Part;
>
> (b) the contraband test procedure form, see section 1010.8(c) of this Part;
>
> (c) the test report prepared by an outside agency subsequent to testing of the substance; ***if any***;
>
> (d) a statement of the scientific principals and validity of the testing materials and procedures used (for the Public Safety, Inc. NIKR System, see 1010.8(c) of the Part).
>
> (e) a photocopy of the individual test instructions for each test used.

7 N.Y.C.R.R. § 1010.5 (emphasis added).  Even if defendant Gutwein had violated

this regulation, as stated above, the violation of a state regulation alone does not

generally rise to the level of a constitutional violation.[10] *Soto v. Walker*, 44 F.3d at

---

[10] In any event, the court also finds that the state regulation was not violated.  Although plaintiff argues that the hearing officer "must" include the test results from an "outside" laboratory, a careful reading of section 1010.5(c) shows that the regulation does not require there to be such a test included with the hearing record.  The regulation states that the test of an outside laboratory shall be included in the file, if there is such a test.  The words "if any" in the regulation indicate that there need not necessarily be an additional test.  Thus, defendant Gutwein did not violate the New York State regulation by failing to include the outside laboratory test in plaintiff's file, because at the time

173.   Various courts in New York have held that an inmate does **not** have a constitutional due process right to have the alleged drugs retested by an outside laboratory and "to have his disciplinary hearing interrupted, under the circumstances." *Batista v. Goord*, 2005 WL 2179420, at *10 (N.D.N.Y. Aug. 28, 2005) (citing *Peranzo v. Coughlin*, 850 F.2d 125, 126 (2d Cir. 1988)). *See also Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123-24 (S.D.N.Y. 2002); *Bolanos v. Coughlin*, No. 91-CV-5330, 1993 WL 7621122, at *21 (S.D.N.Y. Oct. 15, 1993) (one test of white powder which produced a positive result for controlled substance was sufficient evidence to support a hearing officer's decision).

The facts in *Bolanos* were very similar to those in this case.  White powder was found in a plastic bag in inmate Bolanos's cell. 1993 WL 7621122, at *2.  The powder was tested using the NIK test. *Id.*  The test indicated the presence of cocaine, and Bolanos was charged with possession of a narcotic. *Id.*  Bolanos denied that the white powder found in his cell was cocaine[11] and requested that the substance be tested again. *Id.* at *3.  His request was denied, and Bolanos was found guilty after a hearing at which the officer who actually performed the test did not testify because he was "unavailable." *Id.* at *5.  Instead, the hearing officer received testimony from another officer who was in the room when the NIK test was being conducted. *Id.* at *4.

_____

of the hearing, no such test had been conducted.  Additionally, defendant Gutwein did not violate the New York State regulation by failing to adjourn the hearing until the outside test could be obtained, regardless of the fact that the outside test result was ultimately negative for cocaine.

[11] Bolanos maintained that the white powder contained vitamins. 1993 WL 7621122, at *3.

Bolanos's disciplinary determination was ultimately reversed, "based on an analysis of the white powder done by an outside lab which found no controlled substances." *Id.* at *5.

The court in *Bolanos* found no due process violation because "[t]he test performed on the white powder also provided sufficient evidence," even though the sample was only tested once prior to the hearing, and no confirming test was performed at that time. *Id.* at *9. The court reasoned that unlike urinalysis testing which can be affected by medications or foods, the risk of a false positive is not as great with a white powder. *Id.* Additionally, the court emphasized that "it was not clearly established at the time of this hearing that a confirmatory test on a white powder was required, and defendant . . . is entitled to qualified immunity." *Id.* (citation omitted).

The same is true in this case. Qualified immunity generally protects governmental officials from civil liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In evaluating whether a right was clearly established at the time a civil rights defendant acted, the court must determine: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and, (3) whether under pre-existing law a reasonable defendant official would have understood that his or her acts were unlawful." *African Trade & Information Center, Inc., v. Abromaitis*, 294

23

F.3d 355, 360 (2d Cir. 2002) (citations omitted).  Even if the constitutional privileges are clearly established, a government actor may still be shielded by qualified immunity "if it was objectively reasonable for the public official to believe that his acts did not violate those rights." *Kaminsky v. Rosenblum*, 929 F.2d 922, 925 (2d Cir. 1991) (citing *Magnotti v. Kuntz*, 918 F.2d 364, 367 (2d Cir.1990).

Based on the case law cited above, no reasonable official could believe that he was violating plaintiff's constitutional rights by refusing to wait for an additional test prior to concluding plaintiff's disciplinary hearing.  Thus, plaintiff's first challenge to the sufficiency of the evidence at his disciplinary hearing cannot succeed.

### b.    Defendant Ruff's Testimony and Memorandum

Because plaintiff argued that the white powdery substance found in his cell was the cleanser, AJAX, and that AJAX could produce a false positive NIK test, defendant Ruff performed a NIK test on AJAX.  It is undisputed that the result of the test was that AJAX did not test positive for cocaine.  Defendant Ruff wrote this result in a memorandum to defendant Gutwein.[12]  Plaintiff claims that this "report" was "exculpatory evidence," and that defendant Gutwein's failure to produce the report for plaintiff was a denial of due process.  Defendant Ruff also testified at the disciplinary hearing.  Plaintiff alleges that he was denied due process when he was not allowed to

---

[12] The plaintiff's hearing began on April 28, 2008, and the date of the AJAX test was May 2, 2008, so it is clear that plaintiff could not have been given the Ruff Memorandum before the hearing started.  However, the memorandum was clearly in existence on May 7, 2008, when defendant Gutwein reconvened the hearing.  Plaintiff seems to allege that the report should have been given to him prior to defendant Gutwein mentioning the report in his written disposition.  Plaintiff's claim can be interpreted as an argument that defendant Gutwein used the report to find plaintiff guilty, but did not allow plaintiff to see it first.

cross examine defendant Ruff.

It is true that an inmate must be afforded the opportunity to present evidence, and with some limitations, to know the evidence supporting the disciplinary ruling.[13] *Sira v. Morton*, 380 F.3d 57, 74-75 (2d Cir. 2004).  The court has reviewed the transcript of the disciplinary hearing because it was cited, and specifically relied upon, by plaintiff.[14]  Plaintiff was clearly allowed to ask defendant Ruff various questions, focusing specifically on plaintiff's argument that the "AJAX" would have produced a false positive test result. (*See e.g.* Dkt. No. 75-1; Defs.' Ex. A at 23-28).[15]  At the hearing, plaintiff requested that AJAX be tested to determine if that substance could have produced a false positive result for cocaine. (*Id.* at 26).  Plaintiff also requested that the hearing officer call a representative of the company that manufactured the

---

[13] There are certain security reasons for withholding evidence, such as the identity of a confidential informant. *See Francis v. Coughlin,* 891 F.2d 43, 48 (2d Cir. 1989).

[14] Although this is a motion to dismiss, the court notes that plaintiff has discussed portions of the disciplinary hearing in his second amended complaint, and he has included excerpts of the hearing as exhibits to his proposed third amended complaint. (SAC ¶ 37; TAC Exs. M & O).  Plaintiff relies upon these alleged statements from the hearing in his argument.  The excerpts from the transcript, attached to plaintiff's proposed third amended complaint come from defendants' reply affirmation as indicated at the bottom of the page. (Dkt. No. 79-1 at Exs. M & O).  However, plaintiff has always referred to the disciplinary hearing and has made statements regarding what the hearing officer did or did not do.  A document external to the complaint may become "integral" when the complaint relies heavily upon the document's terms and effect. *Chambers v. Time Warner, Inc.*, 282 F.3d at 152-53. *See also Peter F. Gaito Architecture, LLC v. Simone*, 602 F.3d 57, 60 (2d Cir. 2010) (in a Rule 12(b)(6) motion, the court derived facts from the allegations in plaintiffs' amended complaint together with those documents "attached to the complaint as an exhibit or incorporated in it by reference") (quoting *Chambers, supra* at 153).  Because the court is considering both defendants' motion to dismiss as well as plaintiff's motion to amend, the court has considered all the allegations and submissions contained plaintiff's documents, including the entire transcript of the disciplinary hearing.

[15] The pages of the transcript are clearly marked on their own, thus, the court will cite to the page number of the transcript at the top left corner of the page.

NIK test to ask a representative whether AJAX could test positive for cocaine. (*Id.* at 25-26). The hearing officer **granted** the request, and Alan Miller, the technical manager for "NIK public safety" testified at the hearing. (*Id.* at 32-35). He was questioned extensively by the plaintiff. *Id.*

The plaintiff specifically asked Mr. Miller whether AJAX could produce a false positive result, and Mr. Miller stated that it was not possible because AJAX did not contain the appropriate chemical compounds. (*Id.* at 32). Mr. Miller also testified, however, that although other cleaning substances were tested by his company, AJAX was not one of them. (*Id.* at 33). Plaintiff also asked if the test were 100% no flaws" or whether the test could produce inaccurate results based on the test procedures. (*Id.* at 34). Mr. Miller conceded that the company could not test every possible substance to determine whether it could produce a false positive result, but that the test is "deemed reliable . . . to test for the presence of cocaine." (*Id.*). Based on the above, plaintiff's claim that he did not get a chance to "cross-examine" defendant Ruff is completely contradicted by the transcript of the hearing upon which plaintiff relies for this argument.

Plaintiff also complains that defendant Gutwein withheld exculpatory evidence when he did not allow plaintiff to see defendant Ruff's memorandum, submitted to defendant Gutwein after defendant Ruff tested the AJAX and found that it did not create a false positive result for cocaine. As defense counsel argues, defendant Ruff's memorandum, indicating that AJAX did **not** produce a false positive result for cocaine is **not** exculpatory evidence. Additionally, during the hearing, plaintiff requested that

the test be performed, thus, the test was performed after the hearing was concluded. Because the test was not exculpatory, there was no reason for defendant Gutwein to produce the results for plaintiff prior to the hearing decision.

The court also notes that although plaintiff states he was not aware of this information, defendant Gutwein specifically mentioned the report on May 7, 2008, when he reconvened the hearing. (Dkt. No. 75-1, Ex. A at 38).  Defendant Gutwein was reading the evidence that he relied upon into the record, and he mentioned the May 2, 2008 memorandum, written by defendant Ruff.  *Id.*  Plaintiff, however, instead of listening to the hearing officer, became irate and stated that "[t]his is rediculus [sic] . . . what am I supposed to cooperate with you in a hearing where you. [sic] Gimme my disposition I want to get out of here." *Id.*  Although plaintiff was clearly told about the results of the test, that plaintiff himself requested to be performed, he did not articulate a specific objection to the evidence when defendant Gutwein read the information into the record and missed a chance to discuss the report with defendant Gutwein.  The memorandum only confirmed what plaintiff was told at the hearing.

In plaintiff's response to defendants' motion to dismiss, he cites *Howard v. Wilkerson*, 768 F. Supp. 1002 (S.D.N.Y. 1991) for the proposition that plaintiff could not be found guilty, based upon information that had not been shared with him. (Dkt. No. 74 at 8). While plaintiff is correct in his citation of the law, the facts in this case are distinguishable from *Wilkerson*.  In *Wilkerson*, the defendants claimed for the first time in their responses to plaintiff's request for admissions in his federal action, that the hearing officer had "more information that the written material before him." *Id.* at

1009.  Plaintiff in *Wilkerson* was not informed what that additional material was, while in this case, plaintiff requested that AJAX be tested, and defendant Gutwein read the results of the test into the record in the presence of plaintiff.  Thus, the failure to provide plaintiff with a copy of the memorandum itself does not rise to the level of a due process violation.

Finally, plaintiff alleges that defendant Ruff was "grossly negligent" in failing to perform the NIK test in accordance with DOCS Directives.  Once again, the violation of a state regulation does not generally rise to the level of a constitutional violation. *Soto v. Walker*, 44 F.3d at 173.  Even if defendant Ruff was grossly negligent and violated the DOCS Directives regarding the testing of contraband substances, this would not rise to the level of a due process violation.  Thus, the evidence was sufficient to find plaintiff guilty of the contraband violation even though the finding was later reversed because the additional test produced a negative result.  Plaintiff was not denied the opportunity to question defendant Ruff, nor was he denied "exculpatory evidence" or the opportunity to "marshal" evidence when he was not provided defendant Ruff's memorandum.[16]

### c.    Witnesses

Plaintiff alleges that defendant Gutwein "dismissed" the testimony of two of plaintiff's witnesses, Morgan Cox and Juan Benedict. (SAC ¶ 37).  Plaintiff's due

---

[16] To the extent that the memorandum was inculpatory, there was sufficient evidence to find plaintiff guilty of the misbehavior with or without defendant Ruff's memorandum.  The testimony of Mr. Miller, stating that AJAX would not produce a false positive test result for cocaine was sufficient evidence of this fact, and as stated above, Mr. Miller was questioned by plaintiff at the hearing.

process protections include the right to "call" witnesses. *Sira v. Morton*, 380 F.3d at 69.  A review of the hearing transcript show that both Inmate Cox and Inmate Benedict testified at plaintiff's disciplinary hearing. (Dkt. No. 75-1, Defs.' Ex. A at 5-10).  Each inmate testified that plaintiff kept AJAX in a manilla envelope, with his legal papers, and that plaintiff used this cleanser to clean the shower and the toilet. (*Id.* at 7 (Benedict testimony); 10 (Cox testimony)). Inmate Benedict testified that he helped plaintiff clean the shower with the AJAX. (*Id.* at 6).  Inmate Benedict also explained why he believed that defendants got a false positive result from testing AJAX, based upon Benedict's reading of the directive regarding how the cocaine turns colors during the test. (*Id.* at 6).  Inmate Cox testified that, although he was not familiar with the incident itself, he did know that he was plaintiff's "bunkie" for some time and that plaintiff did see plaintiff keep AJAX in his cell. (*Id.* at 10).

Because it is clear that both inmates testified extensively for plaintiff, he must be arguing that his due process rights were violated because defendant Gutwein did not "believe" the witnesses.  However, while plaintiff has the right to have witnesses called on his behalf, there is no corresponding right that the testimony of those witnesses must be believed by the hearing officer.  It is the province of the hearing officer, as the fact finder, to weigh the evidence and make findings of credibility. *Superintendent v. Hill*, 472 U.S. at 455.  In the disciplinary hearing context, due process does not require the independent assessment of the credibility of witnesses or the reweighing of evidence. *Id.*  Thus, the fact that defendant Gutwein did not believe plaintiff's witnesses does not state a constitutional claim, and the evidence was

constitutionally sufficient to find plaintiff guilty of the misbehavior.[17]

The complaint may, therefore, be dismissed as against defendants Ruff and Gutwein for the failure to state a due process violation against them.  Because defendant Bezio's involvement in plaintiff's claims was only to affirm the results of a disciplinary hearing that this court found comported with due process,[18] the second amended complaint may also be dismissed as to defendant Bezio.[19]  Plaintiff also alleges that defendant Behrle, (the Superintendent of Greene), failed to protect plaintiff's due process rights "after being put directly on notice by Plaintiff." (SAC ¶ D(1)).  For the same reason that the court recommends dismissal against defendant Bezio, the court also recommends dismissal of plaintiff's due process claims as

---

[17] The court notes, although not relevant to its decision, that in an exhibit submitted with plaintiff's proposed third amended complaint, it appears that Inmate Benedict may have also been the subject of a charge for the possession of the drugs since he was plaintiff's cell-mate. (TAC Ex. P). This exhibit is the "Controlled Substances Report," finding that the substance did not test positive for cocaine.  The subjects of the report are listed as both plaintiff and Inmate Benedict.  The court mentions this only because defendant Gutwein may have believed that Inmate Benedict may have had a motive to testify the way he did about the substance found in the cell.

[18] Defendant Bezio actually reduced the penalty to 18 months SHU and 24 months loss of good time, together with the original penalty of 36 months loss of privileges. (SAC, Ex. L).

[19] The court notes that if plaintiff had stated a due process claim, the fact that defendant Bezio affirmed the disciplinary finding could constitute sufficient personal involvement. *See Thomas v. Calero*, No. 09 Civ. 5209, at *11-18 (S.D.N.Y. Mar. 17, 2011) (Report-Recommendation) (lengthy discussion of personal involvement as it relates to the affirmance of a disciplinary hearing and determination that such a claim would survive a motion to dismiss); *Rodriguez v. Selsky*, No. 9:07-CV-432, 2011 WL 1086001, at *4-7 (N.D.N.Y. Jan. 25, 2011) (Report-Recommendation), *adopted on other grounds*, (N.D.N.Y, Mar. 3, 2011). *But see Tafari v. McCarthy*, 714 F. Supp. 2d 317, 383 (N.D.N.Y. 2010) (citing *Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002)) (finding no personal involvement).  Without engaging in a lengthy discussion, this court finds that *Joyner*, a case involving a *grievance* review in a medical care case, is distinguishable from the review of a disciplinary hearing).

against defendant Behrle.[20]

## VI.   <u>Retaliation</u>

### A.   **Legal Standards**

Any action taken by defendants in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants. *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiffs must set forth non-conclusory allegations. *Id.* (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).  Finally, even if plaintiff makes the appropriate showing, defendants

---

[20] Plaintiff has submitted a memorandum from defendant Superintendent Behrle, written to plaintiff on April 30, 2008, responding to plaintiff's letter of April 24, 2008. (SAC, Ex. D).  In this memorandum, defendant Behrle makes it clear that disciplinary hearings are conducted on behalf of the Superintendent by the hearing officer (defendant Gutwein). *Id.*  Defendant Behrle also states that "[a]s part of the formal hearing process, the hearing officer will confirm with the drug testing manufacturer that Ajax does or does not register as part of their drug testing protocol.  Additionally, the hearing officer may request re-testing of the substance in question if he feels there is a need for such." *Id.*  Thus, it is unclear how defendant Behrle would have been involved in any due process violation.  He referred the hearing to defendant Gutwein, and defendant Behrle told plaintiff that the hearing officer would confirm plaintiff's allegation.  As stated above, there was no due process violation during the hearing, and in fact, plaintiff's argument was fully investigated, albeit not to his satisfaction.  Plaintiff's disagreement with the results does not create a due process violation.

may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Bennett*, 343 F.3d at 137.

### B.   Application

#### 1.   Protected Activity

Grievances or complaints to the Inspector General are considered constitutionally protected actions. *See Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (grievances); *Smith v. Maypes-Rhynders*, No. 07 Civ. 11241, at *4 (S.D.N.Y. March 31, 2009) (complaints to IG or filing internal grievances); *Crenshaw v. Herbert*, 445 F. Supp. 2d 301, 303 (W.D.N.Y. 2006) (filing lawsuits or grievances are constitutionally protected activities).  Plaintiff states that he complained about defendant Klein to the Inspector General and alleges that defendants' actions were motivated by this complaint.  Thus, plaintiff has sufficiently stated the first factor of a claim for retaliation.  The court will proceed to analyze whether the defendants' alleged actions rise to the level of "adverse" actions, and if so, whether plaintiff has sufficiently stated that the adverse actions were motivated by his complaint against defendant Klein.

#### 2.   Adverse Action

##### a.   Urinalysis Testing

Plaintiff claims that he was subjected to "random" urine testing by defendant Santos on April 21, 23, and 24, 2008.  The fact that defendant Santos[21] ordered three

---

[21] This assumes that defendant Santos was aware of plaintiff's protected activity.  There is, however, no indication that he knew about plaintiff's complaint, which according to plaintiff, was made four months prior to the dates of the urine testing.

urine tests for plaintiff in three days does not rise to the level of an adverse action that would deter an inmate from asserting his rights. *See Bumpus v. Canfield*, 495 F. Supp. 2d 316, 327 (W.D.N.Y. 2007).  In *Bumpus*, the court held that "urine tests are a fact of prison life . . . , and I do not find that one urine test would chill a prisoner of ordinary firmness from filing grievances." *Id.* (citations omitted).  The court found that the urine test was "'simply *de minimis* and therefore outside the ambit of constitutional protection.'" *Id.* (quoting *Dawes*, 239 F.3d at 493).  While plaintiff in this case alleges that he was subjected to three tests, this court does not find that the extra two tests would change the result.

### b.    Cell Search

To the extent that plaintiff claims that his one cell search was retaliatory, it is well-settled that retaliatory cell searches are not actionable under section 1983. *See Salahuddin v. Mead*, No. 95 Civ. 8581, 2002 WL 1968329, *5 (S.D.N.Y. Aug. 26, 2002) (collecting cases).

### c.    Misbehavior Report

To the extent that plaintiff claims the misbehavior report was "false," false allegations alone do not rise to the level of a constitutional violation. *Freeman v. Rideout*, 808 F.2d 949, 952-53 (2d Cir. 1986), *rehearing denied*, 826 F.2d 194 (2d Cir. 1987), *cert. denied*, 485 U.S. 978 (1988).  It is true, however, that a false misbehavior report filed in retaliation **for the exercise of a constitutional right** is actionable as a substantive due process violation. *See Franco v. Kelly*, 854 F.2d 584, 588-90 (2d Cir. 1988).  Thus, to the extent that plaintiff claims that defendants Gilbaro, Bailey, and

33

Plonka issued plaintiff a false misbehavior report, this claim **on its own** would not rise to the level of a constitutional violation[22]. The court must then determine the sufficiency of plaintiff's claim that the misbehavior report was issued in retaliation for his complaints about defendant Klein to the Inspector General.

### 3.      Causal Connection

Plaintiff alleges that he complained to the Inspector General about defendant Klein between November 2007 and January 2008. There appears, however, to be absolutely no connection between Klein and the other defendants, except that they are all corrections officers at Greene. In fact, by the time that plaintiff alleges that Inspector Feliciano visited him, defendant Klein was no longer working at Greene.[23] In the proposed third amended complaint plaintiff now alleges that defendant Tietz escorted plaintiff to the interview room and stayed outside to listen to the conversation.[24] However, defendant Tietz was not involved in the cell search, finding

---

[22] If the false charges trigger a hearing that does not comport with due process, then the person who filed the charges may be liable for their consequences. *Jones v. Coughlin*, 45 F.3d 677, 679 (2d Cir. 1995). In this case, as stated above, the hearing comported with due process, thus, there is no claim for a false misbehavior report alone.

[23] Plaintiff states that he and Klein were transferred from Greene to Great Meadow in April of 2007. (SAC ¶¶ 11-12). Plaintiff states that he was transferred back to Greene in September of 2007 and complained to Inspector Feliciano "between" November of 2007 and January 2008. Plaintiff never states that defendant Klein was transferred back to Greene, and apparently, plaintiff had no further contact with defendant Klein, relevant to the claims in this case. When plaintiff complained to Inspector Feliciano, defendant Klein was no longer at the same facility as plaintiff, so it would be very difficult for defendant Klein to have been aware of the complaint. The court notes that Greene and Great Meadow are not even close together. (DOCS Facilities Map, http://www.docs.state.ny.us /mapselec.html).

[24] Plaintiff may have included this fact in his proposed third amended complaint to bolster his claim of retaliation. (*See* TAC ¶ 17). However, plaintiff has already stated that he spoke to defendant Tietz about plaintiff's complaints about defendant Klein. (SAC ¶ 10). Thus, the fact that defendant

the contraband, or filing the misbehavior report.  Thus, there is still no connection

between plaintiff's protected activity and the conduct that plaintiff claims is

retaliatory.  In the second amended complaint, plaintiff states that he "advised"

Inspector Feliciano that "all of defendant Klein's friends currently work in GCF and

that he felt they would retaliate after learning of the statements Plaintiff made against

Defendant Klein." (SAC ¶ 17).  Plaintiff's "feeling" that defendant Klein's unknown

friends would be somehow retaliating against him after they found out about the

complaint is not a basis for a constitutional claim.

Plaintiff states that defendant Gibilaro ordered defendants Bailey and Plonka to

search plaintiff's cell–an action which would not support a retaliation claim.  Even if

the cell search was an "adverse action," plaintiff does not make any factual allegation

indicating that defendant Gilbilaro knew of plaintiff's complaints about defendant

Klein or otherwise harbored a retaliatory motive.  Because defendants Bailey and

Plonka searched the cell in response to a direct order from a superior officer, they

clearly had a non-retaliatory reason for their actions.

Plaintiff does not deny that the cell search led to the discovery of white powder

apparently concealed in an envelope.  Plaintiff claims that the white powder was

AJAX, and that defendant Ruff was grossly negligent, or did not follow DOCS

---

Tietz may have also overheard the conversation with Inspector Feliciano does not need to be added in
an amended complaint.  The third amended complaint also adds facts regarding the "claims" against
defendant Klein.  Plaintiff now wishes to add that he told Inspector Feliciano about Klein's
involvement with "criminal activities" on "the streets."  Certainly plaintiff could have added these
facts in his second amended complaint, and may be attempting to add them now for shock value, but
these additions would not make a difference in this court's recommendation, and any such additions
would be futile.

protocol, in testing the substance.  But again, plaintiff makes no factual allegation indicating that defendant Ruff knew of plaintiff's complaints to the Inspector General, or otherwise was acting with a retaliatory animus.[25]  And, the discovery of the powder and the positive field test clearly provided a legitimate, non-retaliatory reason for the filing of a misbehavior report against plaintiff.

Plaintiff claims that defendant Gutwein should have waited for the results of re-testing before adjudicating the misbehavior report against plaintiff.  However, as discussed above, the hearing officer's decision was consistent with due process and the applicable DOCS protocols.  Moreover, plaintiff again provides no factual support for the suggestion that the hearing officer was acting with knowledge of plaintiff's complaints about defendant Klein or acting with a retaliatory motive.

In sum, plaintiff has made only conclusory allegations of a causal connection between his protected conduct and the filing of the misbehavior report against him, which was ultimately reversed.  Plaintiff has failed to state a plausible claim of retaliation, and the motion to dismiss that claim should be granted.  While plaintiff claimed that it was a cleaning product, the initial test result was positive for cocaine.

---

[25] The court must point out that it is making no findings regarding plaintiff's guilt or regarding the errors that may or may not have occurred in testing the substance.  The court notes that in plaintiff's response to defendants' motion to dismiss, he now alleges that defendants "indeed planted cocaine in place of 'AJAX' in plaintiff's cell and issued a false misbehavior for the plaintiff." (Dkt. No. 54 at 52).  This is the first time plaintiff makes such a claim, and it is not supported by any of the previous allegations or claims that plaintiff made at his disciplinary hearing or in his amended complaint.  In the amended complaint, plaintiff stated that the NIK test results were "in error" because defendant Ruff did not adhere to proper protocol.  If cocaine had been planted in place of plaintiff's AJAX, then the test results would have been correct, and presumably, the test would have been confirmed by the outside laboratory.

Whether defendant Ruff erred in testing the substance does not show retaliation for plaintiff's complaint about defendant Klein. Thus, plaintiff's claim of retaliation must fail.

## VII.   Conditions of Confinement

Plaintiff claims that on April 1, 2007, defendant Klein moved plaintiff to a filthy cell, where the shower was filled with rust and the drain clogged with hair. (SAC ¶ 10). Plaintiff also alleges that the conditions in his SHU in cell in 2008 were deplorable and violated his right to be free from cruel and unusual punishment. In order to show that conditions of confinement violate the Eighth Amendment, the plaintiff must demonstrate that the conditions result in an "unquestioned and serious deprivation of basic human needs," and that defendants imposed those conditions with deliberate indifference. *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Whitley v. Albers*, 475 U.S. 312, 319-20 (1986); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)).

Plaintiff's first claim deals with defendant Klein and occurred prior to any complaint to the Inspector General's office, but after the alleged conversation with plaintiff regarding Klein's roommate.[26] Plaintiff alleges that, when plaintiff only had three days left on that SHU sentence, defendant Klein moved plaintiff to a filthy cell, where the shower was clogged with hair, and did not give him a plunger to fix it.[27]

---

[26] Because this incident occurred prior to any complaints to the Inspector General's office, there is no indication that this is related to any retaliation claim.

[27] In plaintiff's response to the motion to dismiss, he now states that there were "snots and dried spit on the walls." (Dkt. No. 74 at 31).

Plaintiff claims that defendant Klein just laughed when plaintiff asked for cleaning supplies.  Plaintiff also claims that his new "bunky" did not speak English at all, and was "clearly incompatible." (*Id.*)

   The fact that plaintiff's new roommate was incompatible or did not speak English does not rise to the level of an Eighth Amendment claim.  The rust in the shower or the shower drain being clogged for three days is unpleasant, inconvenient, and even if plaintiff got athletes foot as a result, does not rise to the level of a denial of hygienic products sufficient to violate the Eighth Amendment. *See Beckford v. New York State Office of Mental Health*, No. 06-CV-561, 2010 WL 1816689, at *12 (W.D.N.Y. May 3, 2010) (citing *inter alia McNatt v. Unit Manager Parker*, No. 3:99CV1397, 2000 WL 307000, at *4 (D.Conn. Jan.18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to the level of Eighth Amendment violation); *Fisher v. Department of Correction*, No. 92 Civ. 6037, 1995 WL 608379, at *5 (S.D.N.Y. Oct.16, 1995) (prison's failure to provide inmate with toothpaste and soap for eight consecutive days, lighting for twenty days, and hot food 65 percent of the time did not rise to the level of Eighth Amendment violation); *Gill v. Riddick*, No. 9:03-CV-1456, 2005 WL 755745, *16 (N.D.N.Y. Mar.31, 2005) ("the temporary deprivation of the right to use the toilet, in the absence of serious physical harm or serious risk of contamination, does not rise to

the level of an Eighth Amendment violation.")).  Thus, plaintiff does not state a claim

against defendant Klein for violation of plaintiff's Eighth Amendment rights with

respect to plaintiff's cell conditions in early April of 2007.

Plaintiff's second claim is that, after plaintiff was charged with possession of

cocaine, he was moved to a filthy cell, where the toilet was clogged with feces. (SAC

¶ 29).  Plaintiff claims that he asked defendants Bailey and Plonka for a plunger, and

even though defendant Plonka told plaintiff that he would get a plunger in the

morning, he did not receive a plunger for three days. (SAC ¶ 30).  There is no question

that allegations of unsanitary conditions may support an Eighth Amendment claim.

*Gaston v. Coughlin*, 249 F.3d 156, 165-66 (2d Cir. 2001).  Even assuming that the

conditions in the cell for three days were what plaintiff alleges,[28] there is no indication

that either defendant Bailey or Plonka was responsible for the failure to give plaintiff a

plunger or even that they knew he did not get one for three days.[29]  A defendant must

---

[28] In responding to the motion to dismiss and in attempting to amend his complaint, plaintiff alleges that he had to urinate in the sink and "defecate on a sheet of paper on the floor and throw it outside his 'rec-pen." (Dkt. No. 74 at 29; TAC ¶ 31).  He states that the odor made him so sick that he repeatedly threw up in the sink. *Id.*  However, there is still no indication that any of the defendants knew about these conditions simply because defendants Bailey and Plonka told plaintiff that he would get a plunger in the morning.

[29] In his response to the motion to dismiss, plaintiff states that, even though he asked "continuously," he did not receive a plunger for 72 hours. (Dkt. No. 74 at 28).  Plaintiff still does not indicate who he asked "continuously," and he does not indicate or even imply that it was defendants Bailey and Plonka.  Based on the facts as stated in the second and third amended complaints, these two defendants were only involved in stating that plaintiff would get a plunger "in the morning."  The court notes that this incident occurred at approximately 6:30 p.m. (TAC, Ex. C; Misbehavior Report).  The misbehavior report indicates that defendant Ruff placed the contraband in the evidence locker at 8:30 p.m. (*Id.*)  It is unclear when plaintiff was transferred to the other cell, however, it was certainly after 6:40 p.m., and it could have been later.  At that time, it was reasonable that the defendants would have told plaintiff that he could get a plunger in the "morning."

have been personally involved in the constitutional deprivation in order to be held liable for the violation. *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983").  Thus, defendants Bailey and Plonka would not be liable for any alleged deprivation because, at worst, they denied plaintiff a plunger overnight, and plaintiff does not allege that they were personally responsible for any extended delay in providing plaintiff with a plunger.

Plaintiff alleges that on April 29, 2008, defendant Santos moved plaintiff to a top bunk "for no reason." (SAC ¶ 33).  Plaintiff also alleges that on May 13, 2008, defendant Santos moved plaintiff to a cell that was filthy and had feces smeared on the wall. (SAC ¶ 40).  Plaintiff claims that defendant Santos refused to provide plaintiff and his "bunky" with anything to clean the wall. (*Id.*)  Further, plaintiff claims that his "bunky" was "clearly incompatible" with plaintiff, and that this was a deliberate attempt to provoke a "problem" between the inmates.  Plaintiff also alleges that defendant went through plaintiff's property, removed pictures of his wife, and never gave him a "contraband slip" for the property.

None of the above allegations rises to the level of an Eighth Amendment violation against defendant Santos.  Although plaintiff alleges that his roommate was "incompatible," plaintiff does not allege that he ever had a problem with this individual.  In his response to the motion to dismiss and in plaintiff's attempt at a third amended complaint, he now alleges that plaintiff had to use his own shirt to clean the

feces off of the wall.  This one-time incident, however, is not a deprivation of "basic human needs."

To the extent that plaintiff claims that these actions by defendant Santos were in retaliation for plaintiff's complaints about defendant Klein, these alleged actions do not amount to the requisite "adverse action" that would deter a similarly situated inmate from attempting to assert his rights.[30]  Thus, plaintiff does not state an Eighth Amendment claim as against any of the defendants, and plaintiff's complaint may be dismissed in its entirety.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to amend (Dkt. No. 79) is **DENIED**, and it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 72) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

---

[30] Even if defendant Santos went through plaintiff's property and removed pictures of plaintiff's wife or even destroyed plaintiff's property, these claims do not rise to the level of a constitutional violation.  The deprivation of property, whether intentional or unintentional is not actionable under section 1983 as long as the state provides an adequate post deprivation procedure. *Hudson v. Palmer*, 468 U.S. 517, 533 (1984).  New York provides an adequate post-deprivation remedy in the Court of Claims with respect to property claims by prison inmates. *See Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996); *Love v. Coughlin*, 714 F.2d 207, 209 (2d Cir. 1983); see also N.Y. Ct. Cl. Act § 10(6) (McKinney 1998).

**APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 12, 2011

Hon. Andrew T. Baxter
U.S. Magistrate Judge